All right. Defense counsel has chosen to divide up your arguments. That is always a risky proposition because usually what happens is lawyer number one gets going and lawyers number two and three get squeezed. So you all have to go back to, well, I guess two of you are from California, one from Texas. You know, don't gang up on the guy from Texas. We won't. Here's the line-up. As I understand it, you have five minutes. Is that correct? That's correct, Your Honor. And Mr. Ware will have eight and then you and Mr. Snelling will come back, you for two and he for five on rebuttal. Is that right? Thank you, Your Honor. Okay. You may proceed. Good morning, Your Honor. Scott Tedman representing Richard Marks. I'd like to focus the time that I have with the court in terms of the Brady issue. That's what I want to focus my comments on. In this trial, Your Honors, we had a situation where the government produced a witness, Freddie Woods, who was a critical part of the government's prosecution case. The first reason this witness was critical was because they were utilizing Freddie Woods' testimony to put a point of connection between Richard Marks, Wayne Anderson, and Carolyn Grosnickle. As I'm sure the Court's aware, Freddie Woods' testimony was that her bank account was being used improperly and she was not, repeat, not authorizing anyone to make wire transfers out of the Pinal County Federal Credit Union. And that was the government's position. That was a critically important part of the government's case as related to the conspiracy in count one. The problem, however, arose when the defense was able to find two witnesses from the bank, Barbara Pisano and Becky Jimenez, who gave statements that they had received information over the phone from Freddie Wood authorizing wire transfers. And this came in after, strike that, this information came in after Freddie Wood had already testified. Now, the government argues, for example, on behalf of Mr. Marks, well, Mr. Marks' lawyer never cross-examined Ms. Woods, so what's the prejudice? There's extreme prejudice to both Mr. Anderson and Mr. Marks, and it comes down this way. One, neither counsel was given a fair opportunity to cross-examine Freddie Wood. Had we been given the information under Brady that we should have been given relative to IRS agent Gerhardt interviewing Pisano and Jimenez, both counsel for both defendants could have aggressively and effectively cross-examined Ms. Wood on her position that she had not authorized the wire transfers. Well, I realize that's not a perfect situation because of the timing, but one of the things that troubles me is that I understood there was an opportunity to recall Wood, recognizing, of course, where you'd already been in the trial, and that opportunity was declined. Your Honor, and I'll address that very specifically. Because that seems to me, I mean, Brady is not, I mean, the notion of Brady is not necessarily to overturn convictions as much as that prosecutors have an obligation that sometimes that obligation may or may not be violated, but if it's violated, the question is, is there prejudice? So how do you respond to that? Absolutely. I think there is prejudice that comes down in three areas very specifically. One, as far as being able to bring Freddie Wood back into court and cross-examine her, this was, one, this was very late in the trial. Two, I think the impact of being able to cross-examine Freddie Wood at that point would have been de minimis. I don't think the opportunity for the jury to see a witness testify the first time and then be immediately cross-examined has a much greater impact than simply recalling her and bringing her back later. I think the effect is lost in a substantial measure. How much time was involved? Yes. You say later. How much later was it that you could have called her? What was the time? I think it was a matter of, and I'm just approximating, Your Honor, but I think it was a matter of about a week later. From the time she testified to the time she would have been recalled, I think it would have been about a week. So your argument is that the jury could not have remembered what her direct testimony was? No, I'm not saying that, Your Honor. I'm saying that, you know, when you have a person testifying the first time and you have an opportunity to trial her, to cross-examine her right away with very specific and pertinent information, that's the most effective way to do it. To let the government bring her back and try to pull the horse back into the barn, I don't think is that effective from the jury's standpoint. I just don't. You know, it could be argued that it's actually equally so because you get a second targeted shot at this witness who you now want to go after. I mean, it seems to me that you obviously had to make a judgment there, but you had the opportunity if there was something substantive. Now, one might infer that you couldn't get much mileage out of the cross-examination, which is why you don't want to do it, but you had the opportunity. And so the timing arguments aren't particularly persuasive. Is there a third reason? Well, there's two other reasons, Your Honor, and this comes up in the motion for a new trial that was presented to the district court. Once the information from Ms. Pisano and Ms. Jimenez was discovered and the declarations were secured and the testimony was given at the trial, that information was relayed to Freddie Wood's counsel. And Freddie Wood's counsel had indicated that if he had known and gave a declaration of this in the motion for a new trial, that that was impeachment information with regard to his client, he would have advised Ms. Wood to not testify, but rather to take the Fifth Amendment, because based on information, it was his view that she would have not told the truth and could have committed perjury. All right. So that is critical because he would have been It is now Mr. Ware's time. Okay. And very quickly, one other thing. Your rebuttal is losing time. The prejudice effect is also very important, Your Honor, in terms of the expert that the defense put on in terms of money laundering, because the money laundering expert was cross-examined by the government, and part of the grant examination was that if a person had authorized somebody to use their bank account, would that be okay? Yes. If they didn't authorize them to use it, would that be a problem? Yes, it would be a major problem. And that was predicated on the Freddie Wood testimony, and the defense expert was not able to testify until before the Jimenez and the Pisano information came to light, and that I think seriously crippled the credibility of the money laundering expert. All right. We'll hear from Mr. Ware. May it please the Court, I'm Mike Ware. I represent the appellant, Wayne Anderson. Wayne Anderson was indicted for and convicted of one count of conspiracy to launder government sting money and one substantive count of laundering government sting money. Trial evidence was legally insufficient to convict him on either count. In any alleged violation of Section 1956A3, the sting provision, or in any alleged conspiracy to violate the sting provision, there's no actual or real specified unlawful activity to kind of anchor the alleged offense to any kind of objective reality. There's only an alleged or make-believe specified unlawful activity under those provisions. And so the heart and perhaps the soul of an alleged A3 violation are the representations made by the law enforcement officer, in this case IRS, to the target, in this case Wayne Anderson. A3, subsection A3 is very clear. The property at issue must be represented to be the proceeds of specified unlawful activity as listed in other parts of the code. And it's worth noting that other parts of Section 1956 do talk in terms of some form of unlawful activity, but that does not apply to the sting statute. It's got to be specified unlawful activity. Therefore, without an adequate and sufficient representation by the law enforcement officer, the alleged financial transaction, whatever it may be and whatever may happen after the alleged financial transaction, does not violate Section 1956. I would submit to this court that at a very minimum, in any case, the representation should leave no question that the property at issue is the proceeds of a specified and of the alleged specified unlawful activity. And in fact, the one time these two law enforcement agents from the IRS dealt with Wayne Anderson, the representations they made to Wayne Anderson on this one time were different in nature and in manner than the representations they had been making throughout this investigation. So let me go back to those representations because they were not you're saying that because the monies were not owned by the financial institutions that the representations don't match the statute in effect. Well, I think there's a number of things. I think, for example, and this came out in the trial as part of the record, when this IRS agent is dealing with Michael Gonnett up in the northeast, he's very explicit that the proceeds he's given to Michael Gonnett, he's trying to hide from the bankruptcy. Yeah, that was a very separate situation. Same with Richard Castellini, also in the northeast. He's very explicit. He's trying to hide these proceeds from the bankruptcy court. And then later on, even with Richard Marks, the co-defendant in this case, he's trying to hide this money from the bankruptcy court. And it's pretty simple. It's pretty straightforward. Gonnett even talks in terms of, well, this is money laundering, you know. But with Wayne Anderson, it is substantially different. It's markedly different from the setting in which this one conversation takes place to the actual content of the conversations. When he's talking about this scenario, I mean, before we get to any sort of technical aspects about whether or not this fits the bank fraud statute, some of the things that this agent says during the context, during this conversation, which takes place in a public place where he admits anybody could overhear, it's a crowded restaurant, and he admits that he never signaled to Wayne Anderson that he was about to get into anything that could be taken as unlawful or illegal by the tone of his voice or by the level of his voice or anything such as that. When he's depicting this scenario, he says, the banks are happier than pigs in slop. That is not something that you would talk about if you were trying to depict a scenario in which a reasonable person would, as the standard is, not could or might arguably take, but a reasonable person would take as a Section 1344 bank fraud. Another thing he says is if you only paid 95% of their loan in, the banks are happy, so willing to do business with you again. Another quote, everyone's happy, and the bank is beating down my door to do more business. I would submit this is not the kind of language that would typically be chosen if one were trying to depict and represent a Section 1344 bank fraud such as a reasonable person would take it to be a Section 1344 bank fraud. Now, I agree with your earlier statement. There are other aspects of this, perhaps more technical aspects. I think the government chides us for parsing the words of the criminal statute, but I think that as lawyers that's one of the things we do. There are some more technical aspects of this, such as the materiality aspect. The purported, in order to be bank fraud, the misstatement has to be material. The purported misstatement in this case, as depicted by the agent in his scenario, is, well, I tell the banks that my customers or this particular customer is having trouble paying me. And so the banks, pursuant to a policy, not pursuant to this statement, but pursuant to a policy, forgive 5% of the loan. And they're still charging him under his scenario, which is the only thing we have to go on in this case. Under his scenario, they're still charging him such high interest rates that they're making money hand over fist and beating down his door to do more business. So, obviously, the banks are not relying on his statement, on that this particular customer is having trouble paying him. But what the government is saying is that, well, technically under the bank fraud statute, the banks don't have to rely on that statement in order for it to be material. The statement just has to be of such a nature that a reasonable bank might rely on it. However, under the scenario, as this agent laid out to Wayne Anderson in their one conversation, no reasonable bank would rely on this statement to forgive 5% of the loan unless it's their policy to forgive 5% of the loan anyway, which in his scenario was the bank policy. The banks would have had a secured interest on the equipment. Evidently, they were choosing not to foreclose on the equipment. And the banks were continuing to do business with him, so they knew he was continuing to do business. Money is a fungible proceed. Money is a fungible property. Obviously, the banks know he's still making money because they're continuing to lend him money to continue to do business. So there's no way this alleged misstatement he says to the bank, which is, well, this particular customer is having trouble paying me, would have a natural tendency to cause the bank to forgive the other 5% of the loan. Thank you. Good morning. May it please the Court, my name is Benjamin Wagner. I'm an assistant U.S. attorney in Sacramento, California, and I represent the government in this case. I'd like to start with the Brady issue because I think the Brady issue is the issue that's raised by both counsel for both defendants, and I think it's the area in which their arguments stray furthest from the facts in this case. And I'd like to start by talking about the nature of the material that was not disclosed here. There's some discussions in Mr. Mark's brief about reports and interviews and all of that, but as the testimony of Agent Gearhart at trial, or to the judge, I should say, when he was exploring this issue made clear, what we're talking about here is Agent Gearhart went to serve a trial subpoena on a bank for records shortly before trial. In the course of serving that subpoena, he was in the bank total about half an hour. He runs into this Becky Jimenez, has a brief conversation with her. She says something about another employee who Agent Gearhart doesn't talk to, and that's it. So it wasn't like these were located as independent witnesses, as witnesses that were interviewed. It was somebody he talked to in the course of serving a subpoena. And importantly, as he testified at trial and as the witnesses then testified, there was nothing about their testimony which was inconsistent with the government's theory or with the documents that had already been produced by the government in the course of the case. Did the jury, did the judge give a jury instruction on this issue? I'm sorry. Did the judge give a jury instruction on this issue? He gave, he gave, he instructed as a sanction, he, as a sanction, he instructed the jury that the government had violated its duty to provide information to the defense. He gave them an instruction on that, if that responds to your question. The witnesses that Becky Jimenez and Barbara Pisano, these two Pinal County Federal Credit Union witnesses, the reason that the defendants say that their testimony was impeaching as to Freddie Wood is really, I think, was not borne out by their actual testimony at trial. I think the most that could be said, the most that could be said for these witnesses is that they were arguably contradictory to Freddie Wood. But the government's view of the evidence, and I think the jury's view as well, was that their evidence, their testimony was not at all inconsistent. The issue here is that Freddie Wood had left her relationship with Keith Anderson years earlier, back in 1998, before these transactions that are at issue here. It's clear from the evidence that Wayne Anderson and Carolyn Grosnickle were using this account to run money through, to run the money that they took in from clients through these accounts down in Costa Rica. There's really, there's no dispute about that. There's a ton of independent evidence that Wayne Anderson and Carolyn Grosnickle were doing that, and there's also evidence that Carolyn Grosnickle was posing as Freddie Wood. The name at 154, the government supplemental excerpt to the record at 154, there's a form that Carolyn Grosnickle sent to the undercover agent when he was joining this organization, the Anderson ARCA organization. And right in the middle of it, it says, Return the form to Freddie Wood at her address in Washington State. Attention, Carolyn. And Becky Jimenez testified at trial that when she called one of the numbers on these wire transfer forms, which you'll find at 282 to 286 of the government supplemental excerpts of record, these wire transfer forms, which are the documentary evidence that show that these transactions were going through this account. And there's two interesting things about those. One, on the upper left-hand corner, there's a phone number that appears there. Well, the agent, undercover agent in this case, called that phone number in the course of the investigation. And who did he get? He got Carolyn Grosnickle on the other end of the line. So there's plenty of evidence that Carolyn Grosnickle was posing as Freddie Wood. The other thing is $60,000 in cashier's checks that was given to Freddie Wood by the undercover agent winds up in this account. So there's plenty of evidence that these other individuals were using the account, were using the name Freddie Wood in order to use this account to move the money overseas. So, really, it's not at all surprising that somebody at the bank thought they were dealing with Freddie Wood. And the two witnesses who came to testify, of course, the main witness, the witness who had conducted these transactions, Becky Jimenez, she testified that she had never met Freddie Wood. The only reason she knew anything about Freddie Wood is that this other employee, Barbara Pisano, had years earlier passed her over, a call had come in, she had passed her over to Becky Jimenez on several occasions. She testified, I think, three to five, but she couldn't remember when that was or how much time had passed. She said they'd never had a three-way conversation. She testified that she had violated the credit union's policy and that she hadn't asked any questions to verify the identity of the caller. So there was really plenty of information before the jury, which indicates that far from being contradictory or far from impeaching Freddie Wood's testimony, that she wasn't involved in this. In fact, both testimonies of both witnesses, Jimenez and Freddie Wood, were perfectly consistent. That is, Freddie Wood wasn't involved in these transactions. Somebody using Freddie Wood's name was conducting these transactions. And Becky Jimenez at the bank thought she was dealing with Freddie Wood. You're doing a great job on an issue that, at least from my point of view, is not very good. Let me get right to the heart of it. There was no representation to the defendant that the undercover man was defrauding a financial institution as defined in the bank fraud suit. And as I understand the law, that's part of the crime, that you're defrauding a financial institution defined as a federally insured bank. Right. And so he doesn't specify the unlawful activity. How do you meet that? No, I think that's not correct, Your Honor. I think he does specify that there's unlawful activity. He says a couple of things. Well, no, wait a minute. Focus on the financial institution. Okay. How does he get in that he's defrauding a federally insured bank? He testifies that these are the facts that were – No, please answer that question. I'm answering the question, Your Honor. All right. Where does he say I'm defrauding a federally insured bank? He says I'm dealing with – he doesn't say federally insured bank. I agree with that. He doesn't say federally insured bank. So what does he say? He says I'm dealing with three banks, and he's previously provided checks that went through Wayne Anderson into the Pinal County Federal Credit Union before this meeting that were drawn on a federal bank, the Wachlovia Bank. Is that the money he's laundering at the moment? No, it's not the cash that he's giving them at the moment. Okay. Cash he's giving them at the moment. Right. So we don't know, Claire, what banks he's dealing with, do we? No, he doesn't explicitly say federal banks. Explicitly or implicitly? Right. Well, he's saying I'm dealing with three banks, at least three banks. Are they federally insured? Well, we know that the cash actually came out of federally insured banks. No. Does the – does Anderson know they're federally insured banks? No. He's not told these are federally insured banks. How is the crime being specified? Well, because he's not required – he's not required, as the cases in this Court have indicated, they're not – the agents are not required to spell out every element of the unlawful activity. That's right. But you've got to specify the unlawful activity. Exactly. And he does. If you leave out what's important, you haven't specified it. Well, I think what's important is he spells out he's a businessman with an ongoing relationship with these banks and that he's defrauding them by taking money in. And one of the things that Mr. Ware, I think, leaves out is he says – he says on a couple of occasions to Anderson in the course of that meeting, I'm lying to the banks, I'm sending them letters in which I falsely state – He's lying. You are the government. You've got unlimited possibilities to script this, and you leave out an essential element. Your Honor, I – I don't say you, but the undercover agent. Right. Understood. I think this issue is exactly the kind of thing that the courts talk about when they say if you're going to have a sting operation in which you are presenting evidence of a specified unlawful activity, regular criminals don't come up to people and say, I'm using a federally insured bank. I've got the account. You may not – this script won't play. You ought to use the bankruptcy script. But a court isn't sitting here to make it easy for you to convict people just on any whim that you put on a little play and fail to specify. No, I understand that. I understand that. But I think – Well, that's your problem. But I think from the totality of the evidence that was before Mr. Wayne Anderson at the time of that meeting, I think he could reasonably infer that he was using federally insured banks. And he did that – Tell us about that. Split it up. There's really two aspects that you need to address. One is it's $100,000, and whether it's actually money owned by or whether something is owned by or under control of the bank. You're having trouble finding that. I agree with you. He doesn't need to lay out all the elements, and he doesn't need to say I'm committing bank fraud. But he needs to have conveyed the essence in a more clever fashion. So address why here it seems like he's saying that these other people owe money to the bank, not that he has, quote, taken money from the bank. No, I think what – So what about the $100,000? Yeah, about the $100,000. What he quite clearly says on a couple of occasions, because Wayne Anderson is asking questions about it, he says, I'm the guy, I'm getting the loans out that are financing these leases. I'm in the leasing business. The money comes to me. I finance these leases. The money comes back to me, and it's an ongoing arrangement with the bank. So I've got this ongoing business. It's not a one-shot deal. I'm in the leasing business. So I have these arrangements. I get the loan money, finance the leases. The customers pay me back. I pay back the bank, and the bank gives me more loans. And what he says – That doesn't match the statute. Well, no, I think it does. How? Because he's lying to the bank in order to get them to provide them with additional loans. He's lying to the bank, and he's saying, you know, he's really siphoning off 5 percent for himself, but he's telling them that the customers haven't paid him back. He's not able to pay back the bank, but he's understood. He's gotten inside information that the bank will continue to do business. Okay, so he says he's lying, so he's doing something false. Yes. Okay, what is he doing so that it says that he's obtaining monies that are owned by or under the custody and control of the bank? Because he's lying to the bank, and he's figured out that he can lie to the bank, siphon off the money, and generate additional loans to keep going to him. It still doesn't answer my question. He's lying. That gets you past the false or fraudulent pretenses. But I go back to my other question is, how does this transaction, as he lays it out, show that there's a scheme to obtain money that's either owned by or controlled by the bank? Because the bank is issuing new loans to him based on his misrepresentations. He's in the business, the leasing business. So every time, as he describes it, it's a monthly cycle. It says at the end of the month, I send a letter, I say they can't pay me. But he realizes that they'll continue to loan him money, and it's in the course of that ongoing scheme that these proceeds are generated. And Mr. Anderson clearly understands that because he asks him, hey, don't the banks understand that you're siphoning off 5 percent for yourself? And the undercover agent again explains it and says, no, they don't understand it. Actually, it's 4 percent I'm paying off this banker who gave me this inside information. But they don't understand it, and I keep this going. And he's clearly talking about this is an ongoing deal. I've got this $100,000 in cash. And he tells them, I can't put the money back in my bank account. I can't put the cash back in the bank because those are my banks. They're going to realize something is up. This $100,000 he's receiving from the bank, is there any evidence that that money had been transported in interstate commerce? Well, there was. Not as much as there should have been, but there was. And actually, one of the things that I wanted to comment on is that. Just answer my question. Yes. There was the agent was not asked, and I think did not directly state, we carry this money in interstate commerce, that that is what occurred. The money came in interstate commerce, and I think there was a lot of testimony generally about the operation from which the jury I think probably. Right, but what about the $100,000? Yes. So you've got this conspiracy. All your other answers, too, seem to me to go to the conspiracy as opposed to the specific money laundering account. Is there any evidence to link the $100,000 to interstate commerce? Yes, I think there is. Okay. Tell us where to look. A couple different levels. On the $100,000, the agents, Agent Clark, who was the case agent, and I believe Agent Dowling, the undercover agent, testified that all the money that they got out, they got out of these undercover accounts that were in banks that were federally insured. All of the accounts that they were open, the undercover accounts that they testified were about, I think they were in Atlanta, in Boston, in other places in the East Coast. Way to another question, the one I ask. I'm getting very confused. Okay. I'm sorry, Your Honor. I was trying to. Well, you can go ahead and answer Judge McKeown's question, but I think you're on a different issue now than the one I was questioning you. Oh, I'm sorry. Go ahead. Okay. Well, to respond to that question. I'd like to have you answer my question. I think it was the same question, but you're diverting it. Okay. Well, I don't mean to be. The $100,000, there was testimony by none of the agents that all the money that they used in the course of these operations, that they traveled out here for this California meeting on February 1, 2001, with Wayne Anderson. This $100,000 in cash came out of these federally insured bank accounts that they were, these undercover accounts that they were using. That wasn't the testimony, I don't think, unless you can show me the record. It said it came out of case management accounts. Yes, although Agent Clark testified, and I'm quite sure I've cited it in my brief. Agent Clark was asked a couple times, and he testified that each of the accounts that they used, the undercover accounts that they used were federally insured accounts, and the undercover accounts that they talked about were ones that were located on the East Coast. He wasn't asked about the movement, about getting on the plane with $100,000 and bringing it to California. That's what happened, but he wasn't asked about that. But it says the testimony was case management accounts that they got it out of. Was there testimony that every case management account is an FDIC? Yes. And what is the record citation for that? Your Honor? I do recall that testimony. I wrote down all banks were FDIC banks, but I can't remember. I think Agent Clark testified that as a matter of policy it was required by the IRS agents that all the accounts that they used. I just didn't get that the policy was fulfilled. Yes. And that's in the record? Yes, that all the accounts they used were federally insured. Well, I'll take your word for it that it's there. I just didn't get it. I think I've cited that in my brief. The other thing, which – Then let's move back to the other question, and this goes to jurisdiction. In your indictment, which limits the government, the charge was he'd receive $100,000 in U.S. currency, which had been transported in interstate commerce. Now, where is the evidence that the $100,000 received was transported in interstate commerce? Where is that evidence? Your Honor, there was very little direct evidence on that at trial. There was what? As I indicated earlier, the agent was not specifically asked and did not specifically testify. This goes to jurisdiction, so it's kind of important. Well, no, I realize that. I realize that. But the $100,000, there was, I think, a good deal of testimony about how the operation occurred, how the meeting occurred, from which I think the jury could establish that that money came out of these East Coast accounts. From what? From what evidence? This is a matter of jurisdiction. The government has to prove jurisdiction. I understand that. What is the evidence? There, I think, are two things, Your Honor. One is the evidence by the agents that each of the agents who participated in this meeting traveled here from the East Coast and that the accounts that they were using were on the East Coast. But the other aspect of interstate – those seem to me to be disconnected. You know, it's modern day. You don't need to put $100,000 in your suitcase and send it on United Airlines. You just go down to the FBI office in, you know, California or wherever and get the money. So that's the question. I still have – I'm not sure that the fact that they were on the East Coast and the fact that they had bank accounts on the East Coast gets you past the jurisdictional. Would that be the basis for it? Are you saying they had it in the suitcase? Yes. And that was testified? Yes. No, no. The money was delivered in this satchel, in the same satchel. And, in fact, that is the satchel that came from the East Coast with the agents. And do we know that? But, no, there was not direct testimony by the agent that I brought this satchel on the plane with me. So we don't know from the record whether he brought it in a satchel from someplace else or he went down and got some money at the local FBI place. Right. That was not asked, Your Honor. Now, tell us then why it is that we shouldn't dismiss the substantive law account for failure to meet jurisdictional requirement. Well, a couple of matters, Your Honor. One is – I don't think this was raised by the defense. Their argument is a sufficiency of the evidence argument with respect to the Sting funds, and I don't think that was an issue that they raised. But the other thing which I touched on, I think, at some length in my brief, is that the transaction affected interstate commerce in another way, which is that he was accepting Mr. Anderson, who was acting as the accounting department of this AAA organization, this international organization, was accepting the money like a teller accepts money from someone walking into the bank. This was a transaction, as I indicated in my brief, conducting a transaction for purposes of 1956 means initiating, concluding, participating in a transaction. And he was accepting this money not with the idea that he was going to put it in his garage and he was fixing somebody's car there in Fresno. He was taking it in. The whole discussion in the meeting was, okay, here's the money. You're going to credit it to Costa Rica. I'm going to wire it back to my bank in the United States. They talked a little about how that was going to happen. In fact, that is exactly what did happen, and there was testimony, there was evidence seized from Mr. Wayne Anderson's own computer that as soon as he got the money in, a couple days later, he credited this account down in Costa Rica. So what we alleged in the indictment, we talked about the money moving interstate commerce, the cash moving interstate commerce, but we also alleged that he was conducting a transaction, and the transaction I think we were entitled to prove at trial, and I think did prove that that transaction that he was initiating by taking that money affected interstate commerce. That was the whole purpose of the transaction, in fact, was to move this money in interstate commerce and get it back. And the agent testified in great detail that that's exactly what happened, that it was credited to an account down in Costa Rica. He was able to call back. He was able to get the money wired back. And so the transaction within the statutory definition of conducting a transaction did affect interstate commerce. I think the general idea is a good argument, except that in your indictment you limited to money he received, the $100,000 he received. That's the problem. I disagree with what the defense says in their brief, that we were abandoning all other theories. That's something that we alleged, that it was money that traveled in interstate commerce, but the basic elements of the offense we set out is that there was a transaction, and it was a transaction that involved interstate commerce. I think we certainly stated in the brief that the money had moved in interstate commerce, but I don't think that precluded us from, I mean, it's clear from the indictment that what we were talking about here is an international money laundering organization that moved money offshore, and that was set forth throughout the indictment. So I don't think we were precluded from addressing that element of what conducting a transaction means under 1956. Thank you. Since we're talking about the money laundering count, we'll have Mr. Snelling go first on rebuttal. If you can set the clock at five minutes, please. So you have seven. That's correct, Your Honor. Thank you. You're welcome. Wait just a moment. We'll get the clock set to seven. Seven. We'll go ahead. Okay. May it please the Court. We gave him a little extra time. Psychology takes longer than it does. Yeah, we gave him a little extra time. You can have a few extra seconds. Thank you, Your Honor. May it please the Court. I'm Hill Snellings, and I represent Appellant Wayne Anderson. The theme that runs throughout this case, and as I think came out during the Court's questioning, is that the government controlled the scenario. The government held the cards in this case, and that runs through all the issues. That, therefore, is especially important for the government to scrupulously play by the rules. That's true both in terms of the scenario that is portrayed in the sting story. That is entirely a government creation. The defense has no input into that. Let's get to the points that are involved in the case, if we could, please. The government says that the money came out of cash management accounts and that there is evidence in the record that those cash management accounts came from FDIC banks. Do you agree with that? There is evidence that cash management accounts were FDIC-insured. Thank you. However, there is no evidence, none, that I'm aware of in the record, contrary to what the government says, that the satchel of currency was actually transported interstate. That's a different issue. It is, Your Honor. It is. Again, it's important to recognize that even if the undercover accounts were FDIC-insured, that does not bear on the question. I understand. The issue that we're talking about now is can they get to the subsidy bar by saying the money came out of FDIC accounts, and they can, but there's another issue of whether or not there's jurisdiction because of demonstrating that the currency, which had been transferred in interstate commerce, was the money that came to Anderson. And counsel argues that there's sufficient in the record from which we could divine that because the whole idea was one of pumping money back and forth to Costa Rica, et cetera. What's your response to that? Two points, Your Honor. First, as to the actual currency received by Wayne Anderson in Fresno, California, there is, I would submit to the Court, not a shred of evidence in the record to show that that actual currency was brought from the East Coast to California. None. The reasonable supposition in the modern age is that, in fact, when the agents arrived in California, they got the money either from the FBI office or a local bank. The fact that they have a bank account on the East Coast in no way means that that's where that currency came from. The second point is the government's argument that somehow this one hand-to-hand transaction is part of a larger chain of transactions. This is another example of the government holding all the cards. The government didn't charge that in this indictment. This is no mistake. This was a calculated decision. How do I know that? Because the original indictment in Boston did allege not the hand-to-hand transaction, but the idea that there was a whole chain of transactions resulting in money moving offshore and being repatriated to the United States. Do they need, in this case, even if it's not alleged in the indictment, but substantive element is not just that it is an interstate commerce, but that it could affect interstate commerce? Can they satisfy the effect interstate commerce by the nature of the scheme of what's going to happen to the $100,000? No, Your Honor, they can't because they didn't, A, they didn't charge it. That wasn't the theory that was presented to the jury and wasn't the theory upon which a verdict was rendered. Would you then address, again, the substantive issue? He's responded with respect to whether or not it really meets the statute as being some kind of a bank fraud because he said the bank didn't know that they were getting sliced off 4% or 5% total and that Mr. Anderson said he was lying to the bank and, therefore, it's pretty much there. That's bank fraud. Your Honor, I completely disagree with the government's position on that. The banks first obviously knew that they were not being repaid all their money. Banks keep track of whether they're being repaid all their money. They knew they weren't getting it all back, but the sting scenario was that the banks had a policy of being satisfied with receiving 95%. Moreover, the government's sting scenario was that it wasn't just a one-shot deal with the bank, right? Bank loses out 5%. You'd think if they weren't happy, the bank would say, I'm not going to deal with you anymore. But, in fact, the banks kept coming back under the sting scenario wanting to do more business, banging down his door. Well, he says that's exactly what gives you the bank fraud nature of it is this ongoing, you know, in other words, you lie to me once and then I just kind of keep this perpetual, you know, hamster wheel going. Well, Your Honor, I don't think that it constitutes a story that a reasonable person would perceive to be bank fraud where the government undercover agent is saying the banks are happy as a pig in slops. Coming back constantly to do more business with me because it's pursuant to the bank's policy. That simply doesn't sound like a bank fraud, nor would a reasonable person perceive it to be one. And the government was in control of that scenario. Why didn't the government just say, the undercover agent just say, hey, I managed to perpetrate a bank fraud through a loan scheme, and by golly, I need to hide the money because the bank is coming after it. I mean, that's a pretty straightforward story. And there's no reason for the government agents not to have done it, just as there was no reason for the government agents not to have said, for instance, we're dealing with the Bank of America. They could have used a bank that's well known, nationally known and known to be FDIC insured. But the agents didn't bother to do that. They easily could have. In this case, the jury instructions focus on 1344-2. I think that's right. But it seems to me your argument is stronger under subsection 2 than it is under subsection 1. Did this case get limited to a case under 1344-2? Well, I believe that was the only bank fraud provision on which the jury was given any instruction. And I suppose your argument is stronger because of that. Let me ask you a question. Assume, just for the sake of argument, that we conclude that there's insufficient jurisdiction to sustain a subsidy account, but there's sufficient for a conspiracy account. Would we have to vacate the sentence to go back for resentencing under that situation? I think you would, Your Honor, although I would, yes. My short answer is yes, you would, Your Honor. I'm not saying we are. I just want to know your position on that. If, in fact, that happened, a different sentence might be given by the court? It might be, Your Honor. I simply can't say what the district court would do in that circumstance. But if the court were to vacate a count of conviction, I think it would be appropriate to send it back to the district court to revisit that issue. That brings me to the next question. We've asked you a lot of issues on jurisdiction, but the contract part of a conspiracy don't seem to implicate them. How would the issues we've discussed so far implicate the conspiracy count? Well, Your Honor, I think they would implicate the conspiracy count because the only thing in this case, the only transaction that Mr. Anderson was alleged to have been involved in was this hand-to-hand transfer of the $100,000. But it's not the act. It's the conspiracy, entering into agreement to do something. Yes, Your Honor. So how is that implicated? Because if there is no evidence that the only transaction that he was involved in, an agreement to participate in, was this one transaction, and if this one transaction didn't constitute a crime and that was the only thing that he had agreed to do, then it should undermine the conspiracy count against Mr. Anderson as well because the district court found that the pre-existing bankruptcy scenario that involved Mr. Marks was not to be held attributable to Mr. Anderson, even at sentencing, so found that Mr. Anderson was unaware of those and therefore was not involved in an agreement related to those. What about the money running through these other accounts, the brother saying to send it to the other brother, and money going through there and records on his computer? Would that be enough? No, Your Honor, because as the government claims, Mr. Anderson is the accounting department for a larger organization. The point is whether he had the mens rea to be involved in the commission of a crime. And here, when the government undercover agents, the one time that they talk to Mr. Anderson, they're unwilling to clearly say to Mr. Wayne Anderson, hey, we want you to do something that involves criminally derived money. All right. Your Honor. I think that you're well over your time, and I think we have both sides' arguments in mind, so the case of United States v. Marks and Anderson is submitted. We're going to take a short break and counsel for the last case, Hendricks v. Mutual, would come up and get situated.
judges: Wallace, McKeown, Callahan